**In re OCEANSIDE PROPERTIES, INC., Debtor.**

**OCEANSIDE PROPERTIES, INC., Plaintiff,**

**v.**

**BANKERS TRUST COMPANY and City and County of Honolulu, Defendants.**

**Bankruptcy No. 78–00474(4).**

United States Bankruptcy Court, D. Hawaii.

Sept. 11, 1981.

R. Charles Bocken, Honolulu, Hawaii, for Cred. Com.

Randolph R. Slaton, Honolulu, Hawaii, for city and county of Honolulu.

James N. Duca, Honolulu, Hawaii, for debtor.

Erik R. Zen, Honolulu, Hawaii, for Hansen Estate.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

The Complaint for Authority to Sell Parking Stalls Free and Clear of Liens and Petition for Leave to Compromise Controversy filed by Oceanside Properties, Inc., hereafter "Debtor", came on for hearing on June 9, 1981. At said hearing James N. Duca represented Debtor, Erik Zen, Mary Rudolph and Howard Hoddick represented the Hansen Estate, Randolph Slaton represented the City and County of Honolulu, hereafter "City and County", and R. Charles Bocken represented the Creditors' Committee. Based upon the evidence adduced, the records and memoranda filed herein, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. On April 15, 1981, the Debtor filed a complaint for authority to sell certain property free and clear of liens, and a petition for leave to compromise its controversies with the City and County of Honolulu. The Defendants named in the complaint were Bankers Trust Company, hereafter "Bankers Trust", and the City and County neither of whom have raised any objection to the

relief requested by the Debtor. The question of whether the City and County has entered into a legally binding and enforceable agreement to purchase the property described in the Complaint and to compromise its controversies with the Debtor is not before this Court at this time, and the Court makes no ruling upon that matter.

2. This Court has jurisdiction over these matters pursuant to §§ 313(2) and 357 of the Bankruptcy Act, and pursuant to Article VIII of the Plan of Arrangement confirmed by this Court on February 29, 1980.

3. Pursuant to the second amendment to the Debtor's plan, filed on February 28, 1980, any sale by the Debtor of the property described below was subject to the approval of this Court as to the adequacy of consideration for the sale. Prior to the filing of that amendment, the sole common stockholder had objected to the confirmation of the Plan. Upon the filing of this second amendment, the objection of the common stockholder was withdrawn. The objection had been based upon a claim that the plan impaired the rights of shareholders under State law. *See Supplementary Memorandum of Hansen Estate*, filed in Bk. No. 78–474 on February 22, 1980.

4. The Debtor proposes to sell to the City and City and County 896 leasehold parking stall units, which are located on the lower level of the Kukui Plaza condominium project, together with their appurtenant percentage interest in the common elements of the project. The proposed sale price is $3,450,000.00, which is to be paid entirely in cash through an escrow. Payment would be completed by September of 1981.

5. In connection with the sale, all existing controversies between the Debtor and the City and County would be compromised and forever settled. These controversies are currently the subject of five proceedings, all of which originated in this Court. Some of these proceedings are presently on appeal.

6. The first of these controversies is Bankruptcy No. 78–00474(1); Civil No. 80–0132, U. S. District Court (Hawaii); Docket No. 80–4532, Ninth Circuit Court of Appeals. This is an action commenced by the Debtor in this Court for the invalidation of a document purporting to convey to the City and County the 896 parking stalls which are the subject of the current Complaint and Petition. The Debtor's claim is that the conveyance was never legally effective, or was subject to avoidance under the provisions of the Bankruptcy Act. Various counterclaims were made by the City and County. On October 31, 1980, the Debtor obtained judgment in its favor on the Complaint, and the counterclaims were dismissed on February 1, 1980. The rulings of this Court were sustained on appeal by the district court on October 2, 1980. The City and County appealed from that affirmance to the Ninth Circuit Court of Appeals, where the matter awaits briefing. If the Debtor's position in this litigation is ultimately sustained, the Debtor will continue to have title to the 896 leasehold stalls. If the previous rulings are reversed, and the Debtor loses at trial, the Debtor is likely to have no claim to those stalls, and its Class II creditors will be limited in their recovery to various other assets pledged to them under the Plan, whose value is estimated to be insufficient to return more than 10% of the amount of the claims of the Debtor's Class II creditors.

7. The Debtor obtained judgment in Bk. No. 78–0474(1) by relying upon a hitherto uninterpreted portion of Hawaii's tax lien law. Neither of the litigants was able to address the Court to controlling precedent squarely on point.

8. A second controversy is Bk. No. 78–00474(3), *City and County of Honolulu v. Oceanside Properties*. A complaint was filed by the City and County in this Court seeking relief from the automatic stay on actions against the Debtor, and seeking termination of the Debtor's ground lease for the Kukui Plaza project. The Complaint alleges that the Debtor has defaulted under the ground lease by charging parking rentals in excess of "municipal rates". The Debtor contends that it is not subject to the limitation of "municipal rates" upon the charges it may impose for parking stall

rentals, and that the rentals it has charged do not exceed municipal rates. On April 2, 1980, the Debtor filed a Motion for Summary Judgment in its favor, and this Motion was denied. The matter has not proceeded into discovery as of this date.

9. The third controversy is a part of Bk. No. 78–00474; Civil No. 80–0527, U. S. District Court (Hawaii); Docket No. 81–4006, Ninth Circuit Court of Appeals. This proceeding involved the Debtor's objection to the proof of claim for $40,270.41 filed by the City and County. By order dated August 15, 1980, this Court disallowed that claim in its entirety. The ruling of this Court was sustained on appeal by the United States District Court on December 2, 1980. The decision of the United States District Court was appealed by the City and County. The appeal awaits briefing.

10. The fourth controversy involves the petition filed by the City and County on August 14, 1980, to revoke the Debtor's plan of arrangement confirmed by this Court. The petition alleges that the confirmation was obtained in an unlawful and improper way. The Debtor denies these allegations. There has been no hearing upon this petition.

11. The fifth controversy involves a Motion filed by the City and County for the recusal of the Honorable Jon J. Chinen from proceedings in this action, and for the invalidation of all prior orders entered by that judge in the Debtor's Chapter 11 proceeding. Recusal was denied and an appeal was taken by the City and County, Civil No. 80–594, U. S. District Court (Hawaii). That appeal now awaits briefing.

12. In addition to these five matters of litigation, the City and County has informed the Creditors' Committee that it intends to file a claim against the Debtor's estate, in the event its position is not sustained in Bankruptcy No. 78–474(1) by the Ninth Circuit Court of Appeals. As part of the proposed compromise, such a claim would be released.

13. The 896 parking stalls which the Debtor proposes to sell are currently being managed by a professional parking stall operator, Apcoa Parking. The gross revenue received by the Debtor from parking operations in the twelve month period ending March 31, 1981, has been $443,600.00. After deduction of direct operating expenses, consisting of real property taxes, condominium maintenance assessments, *pro forma* lease rent and fees for the managing agent, the Debtor realized an income of $244,800.00, before allowance for overhead, depreciation, general excise tax or net income tax.

14. The Debtor holds its interest in the parking stalls under an apartment lease for each of the 896 condominium parking units. There are two recorded leasehold positions as to the ground underlying the parking stalls which are senior to these apartment leases. The first of these leases, dated June 21, 1972, between the City and County and the Honolulu Redevelopment Agency, provides:

The scope of the Block G development and project as used herein involves a mixed-use leasehold condominium project containing a commercial mall, off-street parking structures, and residential apartment units. There will be approximately 900 apartment units, 1,800 off-street parking spaces, of which at least 900 public parking stalls will be made available at municipal rates and 60,000 to 80,000 square feet of commercial space on the two levels.

15. The 896 parking stalls, as condominium units, are also subject to the terms of the Second Amended Declaration of Horizontal Property Regime and By-Laws of the Kukui Plaza Condominium Project. Article 8.0 of the Declaration provides, with respect to ownership of the 896 stalls:

A parking stall may be separately sold, leased, conveyed or otherwise transferred as a separate unit but only to an owner of an apartment unit, a commercial space unit or the City.

Any prospective purchaser of the Debtor's interest in the parking stalls would be acquiring an interest encumbered by one or both of the foregoing requirements.

16. In addition, the issue of evaluating the Debtor's interest in the parking stalls is clouded by the provisions of Paragraph 37 of the Honolulu Redevelopment Agency (HRA) lease which encumbers the property. This Paragraph provides for a ceiling on the maximum development profit permitted to the Debtor, as developer of the Kukui Plaza project. The profit is limited to 6% of the development cost, after taxes. Unless the development costs of the Kukui Plaza project exceeded $57.5 million, the maximum permitted development profit (i. e., 6%) would not be greater than the after-tax proceeds of the proposed sale. The records of the Debtor reflect that the development costs of the Kukui Plaza project were substantially less than 57.5 million dollars.

17. In determining whether the Debtor has shown cause, within the meaning of Rule 11–54, *Rules of Bankruptcy Procedure*, for the Court to authorize the proposed sale, the Court must evaluate the consideration to be received by the Debtor in this transaction, and must compare that to the value of the parking stalls. The consideration to be received by the Debtor consists not only of the $3.45 million proposed sales price, but also the release by the City of all of its claims against the Debtor. In addition, the Court must consider other advantages which the Debtor would realize upon from the proposed transaction. Such factors as the complexity and hazards of litigation, the expense of attorneys' fees, costs of court and discovery, the time required to prosecute litigation, whether disapproval of the compromise would likely result in the wasting of assets, and whether approval of the compromise might result in economies unrelated to the litigation itself, are all relevant. *Port O'Call Investment Co. v. Blair*, 538 F.2d 849 (9th Cir. 1976).

18. An important factor in this analysis is the value at which the Debtor could sell the parking stalls to a third party, if the proposed sale and settlement were not approved. In making this evaluation, the Court is conscious of the existing encumbrances which affect the property, and the cloud upon title which is the result of the unresolved litigation concerning ownership of the parking stalls and the "municipal rates" limitations alleged to affect its use.

19. The net income currently being generated by the parking stalls is slightly less than $250,000.00 per year, despite the fact that it is presently under professional management by an experienced operator of parking stalls. Capitalization rates ranging from 9% to 16.5%, when applied to that stream of income for the term of the Debtor's lease, generate a value between 1.5 and 2.7 million dollars, which is substantially below the proposed sales price.

20. The Debtor presented expert testimony concerning the evaluation of the parking stalls, in the person of Mr. Don Cowell, an experienced professional appraiser. Mr. Cowell's credentials as an expert on valuation were unchallenged. No other expert evidence on the value of the stalls was offered by any party.

21. Mr. Cowell testified that the parking stalls had a range of values from $3.5 to 4.0 million. The Court finds that the value of the parking stalls, subject to existing encumbrances and pending litigation, does not exceed the values to which Mr. Cowell testified, and may be less for the following reasons:

A. For one segment of the capitalized earnings of the parking stalls, Mr. Cowell used a capitalization rate of only 8.0%. In light of the risk of an adverse outcome in the title and municipal rates litigation, and the prevailing interest rates on risk-free investments to which Mr. Hales testified, the Court believes that a reasonable investor would require a higher return on his investments in the parking stalls;

B. Mr. Cowell's valuation was based upon the projection of the earnings of the parking stalls. The projection assumed that the existing parking rates could be increased, and that the occupancy factor at the increased rate would be 110%, including the float. Yet there was evidence that, even at the existing parking rates, the Debtor's professional parking manager is unable to achieve full occupancy of the parking stalls.

22. In his evaluation, Mr. Cowell relied on the income approach. He did consider the market approach, but did not use said approach in evaluating the parking stalls. He felt that the market approach was not proper in this case because of the restrictions upon the parking stalls contained in the Lease and the Second Amended Declaration of Horizontal Property Regime and By-Laws of the Kukui Plaza Condominium Project. Mr. Cowell could not find any property with similar restrictions.

Mr. Cowell also looked into the cost approach, but did not find such approach appropriate in this case because the parking stalls were part of a larger development and it would be difficult to allocate costs between the parking stalls and the other facilities of the Kukui Plaza project.

23. Apart from the testimony of Mr. Cowell and Mr. Hales, the Court considered all other evidence of the value of the parking stalls to be unqualified and speculative. No credible evidence was offered to show that the alternative uses relied upon by the Hansen Estate as the basis for a higher valuation of the parking stalls were realistic. The encumbrances to which the parking stalls are subject severely curtail the uses to which they can be put, and make Mr. Cowell's conclusions of value realistic.

24. The proposed sale and settlement would also have benefits to the estate arising from the avoidance of delay and expense. The claims which are proposed to be settled are complex, and involve substantial sums in controversy. Some of them are at a very early stage in the litigation process. Final resolution could not be expected for several years, if each matter was litigated to its ultimate conclusion.

25. The proposed sale and settlement will also make it possible for the Debtor to avoid the expense of completing the process of qualifying the notes to be issued to the Class II creditors under the Trust Indenture Act of 1939. The Debtor's inability to locate a local trust company willing to serve as trustee for the indenture notes means that the qualification process may be expensive. The approval of the settlement will make it possible to avoid such expenses.

26. During the pendency of the litigation between the Debtor and the City and County concerning the ownership of the parking stalls and the alleged breach of the ground lease by the Debtor, the prospect of finding an alternative purchaser of the parking stalls is slight. The magnitude of the proposed transaction indicates that a prospective purchaser would be cautious, and the purchase of property during the pendency of litigation concerning the title is not a cautious act. Although the City and County has applied for and been denied a stay pending its appeal of Bk. No. 78–00474(1) under Rule 805 of the *Rules of Bankruptcy Procedure*, it is uncertain whether this would be enough to assure a prospective purchaser that the Debtor could convey to him good title to the stalls. Moreover, the denial of the stay did not remove the uncertainties on the question of whether the Debtor had breached the ground lease, and on the nature and extent of the limitations on the usefulness of the stalls under the "municipal rates" provisions of the HRA lease. Delay in the sale of the parking stalls, including delays resulting from the pendency of litigation, is prejudicial to both the Class II creditors and the preferred stockholders of the Debtor. The Debtor's obligation to these creditors and stockholders arose prior to 1968, and a large number of these creditors are of advanced years. Any lengthy delay in the sale of the parking stalls may, through death or infirmity, permanently deprive some portion of those creditors from the use and enjoyment of the funds owed to them.

27. The operating profit resulting from the conduct of the parking stall rentals in the last twelve months has been slightly less than $250,000.00, before deduction of overhead, taxes, and other administrative expenses. This represents an annual rate of return, based on $3.45 million of invested capital, of only 7.1%, which is substantially below the rates of return currently available on treasury bills, money market funds, and similar instruments. Thus, unless a delay were ultimately to result in a recov-

ery to the estate in excess of the $3.45 million proposed sales price, the delay would detrimentally affect the return available to creditors on the funds which they involuntarily invested with the Debtor more than thirteen years ago.

28. Delay will also cause the Debtor to remain in operation, and to incur overhead expenses for office rent, clerical staff, and managerial personnel. At the present time, the sole function of the Debtor is limited to the liquidation and winding up of its affairs; it has no on-going business operations other than the management of the parking stalls, and it is not expected to engage in any further business operations. As overhead expenses continue to accrue, the return available to creditors and the preferred stockholders of the Debtor necessarily declines, unless delay were likely to result in a greater recovery than that which has been offered. If the expenses resulting from delay were to eliminate any substantial return to the preferred stockholders, the Debtor's ability to thereafter qualify the sale of the parking stalls as tax-free under § 337 of the Internal Revenue Code will be jeopardized. Delay thus creates the risk that the return ultimately available to Class II creditors will be eroded by the substantial amount of income taxes that might result from the sale.

29. The proposed sale and settlement will also enable the Debtor to avoid the legal expense necessarily entailed in the prosecution or defense of litigation, which is estimated to be in excess of $100,000.00. No evidence disputing this estimate was introduced.

30. A special meeting of all of the shareholders of the Debtor to consider the dissolution and liquidation of the Debtor was called by its President on April 29, 1981. Notice was sent by certified mail to all those shareholders at their address indicated on the corporation's records on that same date. That notice was received by the common stockholder, the Hansen estate. Notice of the meeting was also published in the Honolulu Advertiser on April 29, 1981, and on May 6, 1981, this being a newspaper of general circulation. In addition, notice of the meeting was orally given to Oceanside's Board of Directors at a meeting attended by the personal representative of the Hansen estate, on April 28, 1981. Two attorneys for the personal representative attended the May 11th meeting, but did not hold proxies to vote the common stock.

31. At the May 11th meeting of shareholders, the holders of the corporation's outstanding voting preferred stock had 269,080 votes. The corporation's common stock having voting power had 1,000 votes. Of the preferred stock, 230,590 votes were represented by proxies present and voting at the meeting, most of which had been solicited two weeks prior to the meeting. The proxy holders were Ms. Doris Yee, holding 61,970 votes, and the Debtor's Board of Directors, holding 168,620 votes. The Hansen estate, although notified of the meeting, did not attend.

32. All of the stockholders present at the meeting in person or by proxy voted in favor of the dissolution and liquidation of the corporation. These votes comprised 85.4% (230,590/270,080) of the voting power of shareholders of the corporation. If the common stock, currently held in the custody of the clerk of the United States District Court pursuant to the corporation's 1979 Chapter X reorganization plan, is viewed for that reason as not being outstanding, the favorable vote increases from 85.4% to 85.7% (230,590/269,080). The common shareholder has only 0.37% of the total voting power. No shareholder whose proxy was voted at the May 11th meeting has contested the validity of the proxy cast on his behalf, nor did any such shareholder oppose that proposed sale and settlement in these proceedings.

33. These Findings of Fact, insofar as they are Conclusions of Law, are incorporated by reference in the Conclusions of Law hereinafter stated.

## CONCLUSIONS OF LAW

1. There are three legal issues before this Court: first, is the proposed sale and settlement in the best interests of the Debt-

or's estate; second, were all State law voting requirements on the dissolution and sale of the Debtor's assets, as specified in Hawaii Revised Statutes §§ 416–121 and 416–33, met; third, if those State law voting requirements were not met, may this Court nevertheless authorize the sale pursuant to § 313 of the Bankruptcy Act, and Bankruptcy Rule 11–54?

ISSUE NUMBER 1: Is the Proposed Sale and Settlement in the Best Interest of the Estate?

2. In determining whether the proposed sale and settlement is in the best interests of the Debtor's estate, the Court must consider and balance the interests of the various classes of parties interested in the estate. The Class II creditors received, under the Plan, non-recourse interest bearing obligations of the Debtor, secured primarily by the parking stalls and the income which they generate. It is not in the interest of these creditors to delay a sale of the parking stalls in the hope of obtaining a price in excess of the amount that would pay their claim in full. On the contrary, the proposed sale and settlement would not be sufficient to pay their claims in full, but is nevertheless supported by the Creditors' Committee, and is unopposed by any creditor participating in the hearing.

3. The preferred stockholders of the Debtor have an interest in liquidating the Debtor at a time when there are sufficient assets remaining to pay a liquidating distribution to them. Because the Debtor's articles of incorporation put a ceiling on the amount of corporate assets that can be distributed to the preferred stockholders, regardless of the value of the Debtor's aggregate assets, it is not in the interest of the preferred stockholders to delay a proposed liquidation of the corporation for the prospect of pursuing a sale of corporate assets at a price that would yield distributions to the common stockholder.

4. The common stockholder, on the other hand, has the lowest priority of the three classes. By virtue of that junior position, the common stockholder is likely to receive nothing from the proposed sale and settlement. There is no inequity in this result, as long as the reasonable value of the assets of the Debtor does not leave an equity for the common stockholders. The issue, therefore, is whether the consideration to be received from the City and County in exchange for parking stalls is reasonable and adequate. The Court finds that it is.

█ 5. In light of the cost, risk and delay of litigation, the possibility of claims against the estate by the City and County, the possibility that delay in the proposed sale of the parking stalls could create a substantial liability for taxes on the sales proceeds that might otherwise be avoided, and the questions concerning the ownership, usefulness and value of the parking stalls, the proposed $3.45 million sale and settlement of all disputes between the Debtor and the City and County is in the best interests of the estate. The proposed sale of the parking stalls free and clear of all monetary liens and encumbrances, and the settlement of all disputes between the Debtor and the City and County is hereby approved, and all the liens and encumbrances shall be transferred to the sales proceeds at closing.

ISSUE NUMBER 2: Were State Law Voting Requirements On the Dissolution and Sale of Assets, as Specified in Hawaii Revised Statutes §§ 416–121 and 416–33, Fulfilled?

A. Class Voting

7. Hawaii has only one statute addressing voting requirements for the voluntary dissolution of Hawaii corporations, Hawaii Revised Statutes (H.R.S.) § 416–121. This statute [1] provides:

Any corporation wishing to dissolve itself ... may file with the director of regula-

1. On the requirement of approval by "three-fourths of all of the stock ... issued and outstanding and having voting power" and on the requirement of class voting if the corporate articles require it, H.R.S. § 416–121 is identical to H.R.S. § 416–33, dealing with voluntary transfer of corporate assets. Therefore, the latter statute will not be separately discussed.

tory agencies a certificate ... setting forth that the dissolution has been approved, at a meeting duly called for that purpose by the holders of not less than three-fourths of all of stock of the corporation issued and outstanding and having voting powers . . . .

8. H.R.S. § 416–121 does not require voting by class in computing whether the three-fourths requirement has been met. In this respect, it is significantly different from its statutory predecessor, Section 8352, R.L.H. 1945, which required the approval of

[T]he holders of not less than three-fourths of the outstanding shares of each class of its stock even though their right to vote be otherwise restricted or denied by the charter, articles of association, by-laws or resolution of the corporation. . . .

9. The repeal of the requirement for class voting on dissolution was made by Act 176, S.L.H. (1947). The legislative history of this change indicates that its purpose was to prevent the obstruction of the dissolution of a corporation and distribution of its assets by a junior class of voting stock, where the value of the corporate assets was insufficient to reach the junior class. The Report of the Senate Committee on the Judiciary discussed Act 176 in these terms:

The purpose of this bill is to change the present law which requires the vote of three-fourths of each class of stock in order to dissolve a corporation, to provide instead that for dissolution a vote of not less than three-fourths of all stock issued and outstanding and having voting power shall be sufficient.

There have been instances where more than three-fourths of the owners of all stock in the corporation voted for dissolution, but less than three-fourths of one class whose stock represented no assets whatever because of the financial condition of the company, by vote against dissolution, have held up the formal dissolution and distribution of assets of a corporation which was unable to continue in business. Senate Journal (1947) at 732.

The Report of the House Committee on the Judiciary was equally concerned about the possibility of obstructionist tactics by common stockholders, to the detriment of the senior rights of preferred stockholders.

As the law now stands, a corporation can be authorized to liquidate all of its assets by a vote of three-fourths of all stock issued and outstanding under section 8343, but it is not possible to dissolve the corporation and distribute its assets in dissolution without the vote of three-fourths of each class required by section 8352. The result is that a minority interest on one non-preference class of stockholders may block dissolution and distribution of assets, despite the wishes of the majority stockholders, including the holders of preferred shares.

In order to avoid this situation, it is recommended that the "dissolution" section of the statutes be amended to conform to the "liquidation" section so that the vote required for dissolution will be three-fourths of all the issued and outstanding stock, unless the Articles of Association or charter of the corporation otherwise provides. Senate Bill No. 306 accomplishes this end.

House Journal (1947) at 1626.

10. The Hansen estate would have this Court turn back the clock, so as to require class voting on dissolution even though Oceanside's articles of incorporation do not have such a requirement. Such a result would violate both the express purpose of the 1947 legislation and the language of H.R.S. § 416–121.

11. A comparison of H.R.S. § 416–121 with other provisions of Chapter 416 also sustains the conclusion that voting by classes was not intended by H.R.S. § 416–121, unless the articles of incorporation so required. In contrast to H.R.S. § 416–121, H.R.S. § 416–23 (1978) [2] (pertaining to the amendment of corporate articles) provides explicitly for voting by class in certain cir-

---

2. The text of this was amended by Act 223, S.L.H.1978. It is the contrast in the language used in the original version of the statute, rather than its current legal effectiveness, that is the point here.

cumstances not applicable here. In similar contrast, H.R.S. § 416–79 (1978)[3] specifies that the adoption, amendment of repeal of corporate by-laws, an act ordinarily requiring the approval of a simple majority of shares outstanding, requires a majority vote of each class where two or more classes of stock are outstanding. The absence of language calling for class voting in H.R.S. § 416–121, when class voting was specified in its contemporary statutes, H.R.S. §§ 416–23 and 416–79 (1978), must be considered intentional.

12. The requirement that each class of stock approve dissolution by a three-fourths vote is discussed in H.R.S. § 416–121, but the statute makes such a requirement permissive, not mandatory:

> The articles of association or charter may require . . . the separate authorization or approval of three-fourths or a large proportion of any class or classes of stockholders or members, and in such case the authorization or approval of the . . . class or classes shall be required as provided in the articles of association or charter.

The legislative history of Act 176, S.L.H. 1947, quoted above, evidences the public policy of this state that voting on dissolution will not be by classes, unless the corporate articles or charter so specify. H.R.S. § 416–121 treats the matter of class voting in the same manner and in the very same sentence that pertains to voting requirements of more than 75% on the subject of dissolution. The statute requires neither class voting nor more than 75% approval, but such requirements are acceptable, if they are contained in the corporate articles or charter.

13. The Debtor's articles of incorporation contain no provision for voting by classes on any matter other than the election of directors.

Article V Provides:

> The holder of the debentures[4] and of the preferred stock combined together as a

single class shall be entitled to elect seven out of nine members of the board of directors *and in all other respects shall be entitled to full and complete* voting powers and shall have one vote for each $1.00 principal amount of each debenture and one vote for each share of preferred stock. . . .

> The holders of shares of common stock . . . shall be entitled to elect only two out of nine members of the board of directors *and in all other respects shall be entitled to full and complete voting powers . . .* (Emphasis added).

The election of directors is singled out for special treatment, *i. e.*, class voting, by the articles. As to all other matters, voting power is "full and complete", the same phrase being used for the common shares and the preferred. The draftsmen of the Debtor's articles of incorporation thus considered the concept of class voting, but chose to limit its application under the articles to a single issue, the election of directors.

■ 14. The Hansen estate relies upon the existence of class voting requirements in the by-laws of the corporation, contending that their absence from the articles and presence in the by-laws makes no material difference. The Court finds that when the statute specifies that class voting is not required unless the corporate articles so state, the statute means exactly what it says. The statutory word "Articles" should be given its plain, clear and literal meaning. *State v. Sakoda*, 62 Haw. ——, 618 P.2d 1148 (Hawaii App.1980). The plain meaning of the word "by-laws" is different from the meaning of "articles".

15. It must be presumed that the Hawaii legislature was aware of the difference between articles and by-laws when H.R.S. § 416–121 was enacted in its current form. This awareness was manifested in the provision of H.R.S. § 416–80 that "The by-laws

---

3. The text of this statute was amended by Act 71, S.L.H.1977. The amendment is irrelevant to the argument, for the reason stated in note 2.

4. The voting rights of debenture holders were terminated under the Chapter XI plan, which grants all of their voting rights to the preferred stockholders.

of a corporation may include any provisions not in conflict with law or the articles of association or charter ..." H.R.S. § 416–80 clearly indicates a legislative perception that by-laws are not equivalent to articles, but rather are the lowest element of a three-tiered hierarchy. The corporation law is at the top, then come the articles of incorporation, then the by-laws. The lowest tier cannot be inconsistent with either of the higher tiers.

■ 16. The Hansen estate's reliance on the by-laws as mandating class voting runs afoul of H.R.S. § 416–80. The corporation law (H.R.S. § 416–121) provides that voting on dissolution shall not be by class voting, with the only exception being a narrow one: where the articles specify class voting. Oceanside's articles provide for class voting, but only on one issue, the election of directors. The by-laws, in purporting to amend the voting procedures specified in the law and the articles, are inconsistent with them and are therefore void under H.R.S. § 416–80.

17. A very clear indication that H.R.S. § 416–121 did not mean "articles or by-laws" when it provided that voting will be by classes unless required by the "articles" comes from a comparison of H.R.S. § 416–121 with its legislative contemporary, the now superseded H.R.S. § 416–79 (1978)[5] pertaining to the amendment of corporate by-laws. A comparison shows that § 416–79 authorized class voting if the requirement was stated in the articles or by-laws, while § 416–121 provides that such a requirement *must be* in the articles, if it is to be enforceable. The comparison is as follows:

*H.R.S. § 416–79 (1978)*

[provided] further, that the articles of association or charter *or by-laws* of any corporation may require the authorization or approval of ... any class or classes thereof for the adoption, amendment, or repeal of by-laws of the corporation.... (Emphasis added).

*H.R.S. § 416–121 (1978)*

[T]he articles of association of charter may require the authorization or approval of ... three-fourths or a larger proportion of any class or classes of stockholders or members, and in such case the authorization and approval ... of the class or classes shall be required as provided in the articles of association or charter.

This similarity in language, down to the identical use of the obsolete terms "articles of association" and "charter", makes the dissimilarity between the statutes all the more meaningful. Had the Hawaii legislature intended to authorize placing class voting requirements in the by-laws for purposes of a dissolution (§ 416–121) or sale of assets (§ 416–33), they would have written those statutes in the same manner as § 416–79 was written.

18. It is more than a technical distinction whether a provision on corporate voting is set forth in the corporate articles rather than the by-laws. Corporate articles are much less easily amended than by-laws. An amendment to the articles of incorporation requires a two-thirds vote of shareholders (H.R.S. § 416–23), while the amendment of by-laws requires only a majority of the board of directors under current state law [(H.R.S. § 416–79 (1980 Supp.)], and only a majority of shareholders under prior law, H.R.S. § 416–79 (1978). In determining the extent to which a corporate minority can obstruct a majority can impose its will upon a minority), it is important whether the governing principle is contained in the articles or in the by-laws since the ability to amend that principle is determined by its placement in the articles or by-laws.

19. A second crucial difference between articles and by-laws arises under H.R.S. § 416–14. Articles of incorporation and all their amendments are public records, filed with the Department of Regulatory Agencies. Corporate by-laws are not filed anywhere; they are private documents. Anyone dealing with a Hawaii corporation can discover its powers, its procedures and other provisions set forth in its articles. The state officials in the Department of Regula-

---

**5.** The amendment of § 416–79 by Act 71, S.L.H. 1977, does not affect the analysis.

tory Agencies can review corporate articles to determine whether or not they comply with state law or public policy. On the contrary, corporate by-laws are private records with limited access. For that reason, when a statute like H.R.S. § 416–121 permits a certain corporate procedure only when it is authorized in the corporate articles, the term "articles" should be literally construed. A similar provision in the by-laws should be ineffective.

20. The most compelling reason against giving the term "articles" in § 416–121 an expansive reading so as to include by-laws comes from a reflection back to the 1947 amendments of that statute. These amendments reflect a public policy in this State to protect the rights of preferred stockholders against the possibility of obstruction by common stockholders when class voting on matters of dissolution and liquidation is required. Any exception to the statutory language implementing that policy should be narrowly construed. The law provides an exception only where the corporate "articles" provide for one. The exception should not be broadened in the manner urged by the Hansen estate by departing from the plain meaning of that word. To do so would violate the policy embodied in the statute.

### B. *Quorum Requirements*

21. Because voting on dissolution is not by classes, the number of preferred stockholders attending the meeting through their proxies constituted a quorum, *i. e.* a simple majority of all shares entitled to vote.

22. Even if class voting on dissolution is required, all quorum and voting requirements were met. The Debtor sent its shareholders notice by certified mail of the special meeting of shareholders to consider the dissolution of the corporation. It published notice of that meeting in the Honolulu Advertiser once in each of two successive weeks, on April 29, 1981, and on May 6, 1981. It gave personal notice of the meeting to the personal representative of the Hansen estate. The Debtor has thus met the requirements of H.R.S. § 416–121 as to "Notice". Once those requirements have been met, the statute provides,

> [A]fter the mailing and publication each shareholder or member who fails to attend the meeting or fails to acknowledge the notice shall be deemed to have approved at the meeting the dissolution of the corporation. . . .

As a matter of law, whatever requirements may have existed for the attendance of the common stockholder at the special meeting of May 11, 1981, and for his favorable vote on dissolution, are deemed to have been met. Having "approved" the dissolution "at the meeting", common stockholder's arguments about the lack of a quorum and about class voting must fail.

ISSUE NUMBER 3: If Any Shareholder Approvals Required by State Law Were Not Obtained, Are Those Approvals Required in Connection With the Proposed Sale by the Bankruptcy Court?

23. This Court has the authority to approve the sale of the parking stalls under Bankruptcy Rule 11–54 and Section 313(2) of the Bankruptcy Act, and the provisions on the retention of this Court's jurisdiction contained in the plan which are authorized by Section 357 of the Act.

24. H.R.S. § 416–121 requires that shareholder approval of a voluntary corporate dissolution be obtained under most circumstances. It is clear, however, that requirements of state law must yield to the provisions of federal bankruptcy law, where inconsistencies arise. *International Shoe Co. v. Pinkus*, 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318, *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). Such an inconsistency would exist if this Court were to sustain the position of the Hansen estate that the shareholder votes required by the statute had *not* been obtained, for this event has significance only if this Court's power to approve the sale under Bankruptcy Rule 11–54 and Section 313(2) of the Act was limited by the absence of that approval. A limitation on the statutory authority of a Bankruptcy Court created by state law cannot stand.

25. The approval of the proposed sale and settlement in this case necessarily involves a judgment that the cash and other consideration to be received by the Debtor is the reasonable value of the property and other rights being sold. There is insufficient value in those rights to leave anything for the common stockholders. Under that circumstance, the consent of the common stockholders to the sale is not required, since the value of the Debtor's property leaves no shareholder equity for them. *Sportservice Corp. v. Northern Illinois Development Corp.*, 324 F.2d 104 (7th Cir. 1963).

26. A bankruptcy court cannot be compelled by state law to allow shareholders lacking any equity in the estate to dictate how the property of that estate will be administered, and to put at risk the prospect that the creditors will be paid. Yet this unprecedented result is exactly what the Hansen estate is urging: that the court abandon its role of administering the estate for the benefit of creditors because one dissident junior stockholder, holding 0.37% of the total voting power of stock, opposes a settlement found to be in the best interest of the estate as a whole, and supported both by all other shareholders of the Debtor voting on the issue and by all creditors of the Debtor who expressed their views. Such a rule would expose the creditors of insolvent corporations to unreasonable demands from minority stockholders as a condition of liquidating the corporate assets, and would undermine the system of priorities (debenture holders first, then preferred stockholders, then common stockholders) set up in Oceanside's articles of incorporation.

27. *In re May Oil Burner Corp.*, 38 F.Supp. 516 (D.C.D.Md.1941) is inapplicable in the current circumstances, since the reasonable value of the parking stalls in this case is insufficient to pay all liabilities in full.

28. Furthermore, in *May Oil*, the shareholders were objecting to the confirmation of a plan of arrangement which detrimentally affected their rights. In the present case, the common shareholder withdrew his objections to the arrangement, when it was modified so as to require (1) that the sale of the parking stalls required the approval of this Court, and (2) that the common stockholder could be heard on the adequacy of the consideration for the sale. To the extent that *May Oil* holds that shareholders must consent before the bankruptcy court can sell corporate assets, that consent was given at the time the common shareholder withdrew his objection to the plan in exchange for the Debtor's agreement to request court approval of any post-confirmation sale of the stalls.

Based upon the foregoing, a judgment and order granting the relief requested shall be signed on presentation.